(No. 44754.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GONZALO CUEVAR AUILAR, Appellant.

*Opinion filed November 18, 1974.*

James J. Doherty, Public Defender, of Chicago (George L. Lincoln, Assistant Public Defender, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel, Assistant Attorney General, Patrick T. Driscoll, Jr., and John F. Brennan, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

The defendant, Gonzalo Auilar, was found guilty by a jury in the circuit court of Cook County of the murder of Virginia Hunter and sentenced to not less than 20 nor more than 60 years in the penitentiary. His appeal was taken directly to this court under our Rule 603. Ill. Rev. Stat. 1969, ch. 110A, par. 603.

On September 24, 1970, the body of Virginia Hunter was found lying face down in a pool of blood in her apartment in Chicago. Death had been caused by a blow to the head which crushed her skull. A brick and a Viceroy cigarette were found near the body. It was later ascertained that two television sets, four transistor radios (one was an Orion make) and an alarm clock were missing from the apartment.

Four days later Gonzalo Auilar and Edwardo Medina came to the 19th district police station. Medina said to Officer Quentin Muntainer that the police had been

looking for Auilar. The defendant then walked up to Muntainer, who placed him under arrest. He advised Auilar that he did not have to make a statement or say anything; he told him, too, he had a right to have an attorney present, and did not have to sign anything. The defendant was not then questioned but was transferred to another police station.

There Officer William McCoy asked Auilar his name, place of employment and if he had been involved in a homicide. The defendant stated he had been. Officer McCoy then said to the defendant:

"Q. Before I go any further, I am going to advise you of your constitutional rights. You have the right to remain silent. Do you understand that?

A. Yes.

Q. Anything you say will be used against you. Do you understand that?

A. Yes.

Q. You have a right to consult an attorney, do you understand that?

A. Yes.

Q. You have the right to have an attorney present during this questioning, do you understand that?

A. Yes.

Q. If you can't afford an attorney, the Court will provide one for you; do you understand that?

A. Yes."

The defendant answered Officer McCoy's questions about the homicide of Virginia Hunter and signed a statement, which read:

A. Well, I went to the apartment with the other guy with the glasses, I don't know his name. The other guy rang the doorbell and the woman opened the door. We walked up to the door and went into the woman's house. I stayed in the doorway and the other guy went back downstairs and got the piece of brick. I asked her if Johnny was there and she said who. I said Johnny and she said let me see. She went to look at some paper. When she did this the other guy said to me, are you ready, and I said yes. Then this other guy hit the lady with the brick

and she said aiee and didn't say no more. The other guy found two television sets and I found two radios and he found some other radios and put them in a box and said, let's go. No, he found a pillowcase and put them in there. Then he left and the other guy gave one of the televisions to someone else waiting outside and he took the other television and I took the pillowcase with the radios. We carried them for about three blocks and the other guy got a Yellow Cab. We then went to the other guy's house on Aldine and he put the television in his house and said he was going to sell it and give me half the money. And I took four radios to my house. I gave one of them to a guy named Billy, I still have one of the radios in my house, the other one sold for $5.00. I still have one clock in my house that I took from the lady's house."

The defendant also signed a consent for the police to search his apartment. When they did they found the deceased's Orion radio and a package of Viceroy cigarettes. The defendant denied knowing where the cigarettes came from. His motions to suppress physical evidence and statements were heard and denied prior to trial.

The prosecution's witnesses included Officer John Durkin, Officer William McCoy and Carlos Santiago.

Carlos Santiago testified that Eusebio Velasquez, Glidden Velasquez, Gonzalo Auilar and he were standing at the corner of Sheridan and Broadway at 2 p.m. on September 24, 1970. He said that Glidden Velasquez pulled Auilar aside to talk and seconds later he and Auilar left together walking west on Sheridan. When the witness saw them about a half hour later, Auilar was carrying a pillow case containing several objects and Glidden was carrying two television sets. Santiago testified that while they were in jail Auilar had told him that Glidden Velasquez had thrown the brick at Virginia Hunter while he stood by the door. He said that Auilar admitted going into the apartment and picking up the radios.

Officer McCoy testified that he took the statement from the defendant and said that after obtaining the defendant's consent to search his apartment he had gone

there and had found the deceased's Orion radio and a package of Viceroy cigarettes.

The testimony of the defendant was practically identical with the statement he had given Officer McCoy. He said, *inter alia,* that he had been on a street corner with Eusebio Velasquez and Carlos Santiago when Glidden Velasquez pulled him aside and asked him if he wanted "to look for a job." The defendant said yes and Glidden Velasquez then said that they first had to stop at Velasquez's former apartment. The defendant said, somewhat contrary to the testimony of Santiago, that all four began walking together, but that Eusebio Velasquez and Santiago stopped and waited for them on a corner two blocks from the deceased's apartment. He testified that when Glidden Velasquez and he reached the deceased's apartment Velasquez told him to ask for "Johnny." He stated he did so and that the woman said she did not understand what he was saying. Velasquez left the defendant for the purpose of getting the brick to strike Mrs. Hunter. The woman went back inside to get a pen and paper, apparently so that the defendant could write out the question. He stood at the door as Velasquez followed Mrs. Hunter into the apartment. Before Velasquez entered the apartment he asked the defendant if he was ready and the defendant said yes. Seconds later the defendant heard the woman scream. He first testified that he never went into the apartment but he had changed his testimony on cross-examination and said he did enter the apartment. When he went inside to take the pillowcase full of radios from Velasquez, he saw the woman lying on the floor. He acknowledged he made no effort to call a doctor or the police. Afterwards Velasquez told him that he would give him one half of the money he received from the sale of the television sets.

The defendant first contends that his statement was improperly admitted into evidence, as neither Officer Muntainer's nor Officer McCoy's warnings satisfied the

requirements of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. He says the admonitions improperly suggested that there would have to be a court proceeding before he would be entitled to counsel. We need not, however, reach this question.

Though courts have not been unanimous in their reasoning it generally has been held that if a defendant takes the witness stand and admits in substance matters contained in a confession or statement he has given the police, this testimony will be considered to have waived or made harmless any error that may have occurred in the admission of the confession or statement. *Sweeney v. United States* (9th Cir. 1969), 408 F.2d 121; *Hill v. United States* (5th Cir. 1966), 363 F.2d 176; *Commonwealth v. Chase* (1966), 350 Mass. 738, 217 N.E.2d 195; *Chandler v. State* (1968), 283 Ala. 29, 214 So. 2d 306; *Commonwealth ex rel. Adderley v. Myers* (1965), 418 Pa. 366, 211 A.2d 481; *Commonwealth v. Collins* (1969), 436 Pa. 114, 259 A.2d 160; *McClain v. State* (1969), 1 Tenn. Crim. App. 499, 445 S.W.2d 942; *Miller v. State* (1969), 2 Tenn. Crim. App. 169, 452 S.W.2d 369; see McCormick, Handbook of the Law of Evidence, sec. 144, at 310 (2d ed. 1972).

This general holding was illustrated in *Commonwealth v. Chase* (1966), 350 Mass. 738, 742, 217 N.E.2d 195, 198, where the court said: "[T]he question of the legality of Chase's confession was rendered academic when he took the stand at the trial \*\*\* and corroborated every material element contained therein. Thus, had there been error in admitting the confession, this testimony removes conclusively the possibility 'that the evidence complained of might have contributed to the conviction.' " The defendant's argument as to the inadequacy of the *Miranda* warnings does not appear to be impressive but even if there was any error in the admission of his statement, it was cured by his testimony. The testimony corroborated the statement he had given. There is no claim he felt

compelled to testify because of the admission of the confession. It can be said that Carlos Santiago's testimony and the discovery of the deceased's radio in his apartment were influential factors in his decision to testify.

Another argument of the defendant is that the felony-murder doctrine (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(3)) was inapplicable here. The evidence showed, the defendant says, that he intended only to participate in a burglary or a theft and not in a crime that contemplated violence. He says participation in the latter type of crime is necessary for the felony-murder doctrine to be operable.

But this is not so. In *People v. Golson,* 32 Ill.2d 398, it was contended that the felony-murder doctrine could not be applied to a conspiracy to steal from the mails, a nonviolent felony. This court rejected the contention, stating: "In our opinion the test to be applied in determining whether the felony-murder doctrine is applicable is not whether the felony is normally classified as non-violent, but is whether, under the facts of a particular case, it is contemplated that violence might be necessary to enable the conspirators to carry out their common purpose. [Citation.] " *People v. Golson,* 32 Ill.2d 398, 407-8; *cf. People v. Hickman,* 59 Ill.2d 89.

It is clear that the defendant and Velasquez contemplated that violence would be used. The defendant engaged the victim's attention by asking for "Johnny," while Velasquez went to get a brick. When he returned with the brick the defendant answered that he was ready in response to Velasquez's question to him. Velasquez then went into the apartment and murdered Mrs. Hunter.

For the reasons given, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*